# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

ERICK LITTLE, *et al.*,        )
                               )
          **Plaintiffs,**       )
                               )
      **v.**                  )      **Civil Action No. 14-1289 (RMC)**
                               )
WASHINGTON METROPOLITAN     )
AREA TRANSIT AUTHORITY, *et al.*,   )
                               )
          **Defendants.**     )
_____ )

## OPINION

Plaintiffs complain that a criminal background check, used by the Washington Metropolitan Area Transit Authority (WMATA) to screen candidates and employees, is facially neutral but has a disparate impact on African Americans. WMATA's Policy 7.2.3 governs how and when individuals with criminal convictions can obtain or continue employment with WMATA and its contractors and subcontractors. Plaintiffs seek to represent one or more classes of African-American candidates and employees who were disqualified or removed from employment by Policy 7.2.3 in alleged violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the District of Columbia Human Rights Act (DCHRA), D.C. Code § 2.1404.01 *et seq.* After class discovery, Plaintiffs now seek leave to file an amended complaint, class certification of the amended classes, and appointment of Plaintiffs' counsel as class counsel.

The motion to amend the complaint will be denied without prejudice. The motion for class certification will be granted in part and denied in part. The Court will certify three classes, separating candidates and employees based on the Appendix of Policy 7.2.3 that applied to them.

The parties also filed motions to exclude the other's experts. The motion to exclude Dr. Farber will be granted in part and denied in part. The motion to exclude Dr. Bendick will be granted. The motions to exclude Dr. Stixrud's initial report and declaration will be granted in part and denied in part. The motion to exclude Dr. Siskin will be denied.

## I. BACKGROUND

WMATA was created by an Interstate Compact among Washington, D.C., Virginia and Maryland, and approved by Congress, to be the primary public transit agency for the D.C. metropolitan region. Cert. Opp., Ex. 20 [Dkt. 137-2] at WMATA0002330. WMATA operates the region's *Metrorail* system (86 stations and 105 miles of track); *Metrobus* system (135 lines and 12,216 stops); and *MetroAccess* paratransit service for the disabled. *See id.*; *see also* Cert. Opp. [Dkt. 137] at 10. "The Compact confers broad powers on WMATA to '[c]reate and abolish offices, employments and positions . . . provide for the qualification, appointment, [and] removal . . . of its . . . employees, [and] [e]stablish, in its discretion, a personnel system based on merit and fitness.'" *Beebe v. WMATA*, 129 F.3d 1283, 1287 (D.C. Cir. 1997) (quoting D.C. Code Ann. §§ 1-2431(12)(g) and (h)). WMATA argues that it is, thus, generally "immune from attacks upon its discretionary decisions related to its establishment of qualifications for employees," although it recognizes that it is also subject to Title VII. Cert. Opp. at 10 n.6.

Plaintiffs allege that the screening criteria in Policy 7.2.3 are "overly broad, unjustifiably rigid and unduly harsh." First Amended Complaint [Dkt. 84] ¶¶ 1-3, 8-15, 48-102, 103-04, 126-28 (FAC). Plaintiffs complain that:

> [Policy 7.2.3] disqualifies many job applicants and employees based
> on criminal history that is not related to the job at issue or occurred
> so long ago—in some cases, 20 or 30 years in the past—that it is
> irrelevant to any fair determination of employee honesty, reliability,
> or safety.

*Id.* ¶ 1. To clarify Plaintiffs' intentions, their pending Motion for Leave to File a Second Amended Complaint acknowledges that Plaintiffs' expert found no statistical basis to include "WMATA employees who may have been deterred from applying for internal job openings and/or employees who may have been deterred from taking medical or personal leave" or "persons directly employed and subsequently terminated by WMATA." Mot. for Leave to File Second Amended Complaint [Dkt. 117] ¶ 7 (SAC Mot.).

WMATA argues that it adopted Policy 7.2.3 as a business necessity. Cert. Opp. at 11-13. The argument goes to the merits of Plaintiffs' Complaint, not to their motion for class certification. Additionally, WMATA argues that the actual makeup of its employee pool demonstrates that no discrimination occurs. *See id*. at 10-11. Specifically, African Americans constitute seventy-five percent (75%) of WMATA's (employee and contractor) workforce of more than 12,000 individuals. *See id*., Exs. 21-22 [Dkt. 137-2]. African Americans hold 96% of WMATA's bus and rail operator positions. And these numbers exceed the proportion of African Americans in the metropolitan area: 52% of D.C. residents identify as African American; 65% of residents in Prince George's County identify as African American; and the percentages of persons who identify as African American in Montgomery County, Maryland, and the metropolitan counties in Virginia range from between 5 and 22%. *See id.*, Ex. 24 [Dkt. 137-3] at WMATA0002370-2390. While these employment figures are not contested by Plaintiffs, they contend that Policy 7.2.3 bars employment of African Americans more than other races. *See Connecticut v. Teal*, 457 U.S. 440, 453-54, 455 (1982) ("Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group."); *Furnco Constr. Corp. v.*

*Waters*, 438 U.S. 567, 579 (1978) ("A racially balanced work force cannot immunize an employer from liability for specific acts of discrimination.").

From 2009 to 2012, WMATA followed an inconsistently-applied criminal background check policy, which was promulgated through a Staff Notice. *See* Mot. for Cert, Ex. 7, ████████████████████████████████████████████. The 2009 policy divided positions into public-facing and non-public-facing. For all positions, an individual was disqualified if s/he had a felony or misdemeanor conviction of a crime against persons, a sex crime, or a crime against society. For crimes against property or controlled substances offenses, individuals were either disqualified or permitted to have up to two convictions depending on whether the crime was a misdemeanor or a felony or if it was committed more than five or more than ten years ago. *See* Mot. for Cert., Ex. 6 [Dkt. 124-2] ██ ████████████████████████████████████████████████ ████████████████████████.

Starting in late 2009, WMATA's Director of Human Resources, Dr. Amy Celeste-Quillen, began ████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████ ████████ to develop a policy that used criminal background checks to screen applicants for employment. Cert. Opp. at 12-13.

A. **Policy 7.2.3**

Policy 7.2.3 was adopted in December 2011 and took effect on February 23, 2012. Mot. for Cert., Ex. 2, Policy 7.2.3 [Dkt. 124-2] at WMATA0002227. Policy 7.2.3 first applied only to WMATA candidates for employment (those to whom a conditional offer of employment had been extended, pending screening) and WMATA badge contractor candidates

4

who would work on WMATA property for WMATA contractors, as well as employees of WMATA and badge contractors who were seeking to return to employment after a lengthy absence. Badge contractors are WMATA's independent contractors.[1] Employees of such contractors require WMATA badges to gain unescorted access to WMATA property. *See* Cert. Opp., Ex. 31, ████████████████████████████████████████. An Appendix was added to Policy 7.2.3 on January 1, 2013, which extended the Policy to MetroAccess candidates for employment and employees. *See id.*, Ex. 53, ████████████████ ████████████████████████████.

Policy 7.2.3 indicates that its purpose is to "ensure[] that candidates and employees have provided accurate, complete, and truthful information relating to former employment, experience, education, and relevant criminal and/or financial background information." Policy 7.2.3 at WMATA0002227. Policy 7.2.3 applies to all external candidates and to employees under specific circumstances. External candidates are subject to Policy 7.2.3 prior to a final offer of employment. *Id.* Internal candidates, *i.e.*, former employees separated from employment, are subject to Policy 7.2.3 if (1) represented and reinstated or considered for reinstatement after a grievance process or (2) not represented and considered for reinstatement after an employee dispute resolution process. *Id.* Employees are subject to Policy 7.2.3 when (1) they are "under consideration for a fiduciary position or a position that requires unrestricted

---

[1] ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Plaintiffs do not dispute this description, although they dispute its significance.

access to the general public"; (2) they are "under consideration for return to duty" after a "non-work status for a period of 90 calendar days or longer"; or (3) "reasonable suspicion exists" about information which "could impact the employee from performing the duties of the current position held." *Id*. at WMATA0002227-28, WMATA0002232-33.

Section 5.03 of Policy 7.2.3 further outlines "[c]ircumstances that can result in the initiation of a reasonable suspicion screening," including but not limited to:

> (1) Sources of information that can be corroborated that an employee has engaged in conduct that is inconsistent with Metro regulations and/or has been arrested and/or convicted of a crime, i.e., information received from two or more independent sources, testimony, eyewitness statements (oral/written), videotape evidence, and/or protected disclosures;
>
> (2) Information that has been independently discovered during the course of an internal or external investigation that suggests an employee has engaged in misconduct that is inconsistent with Metro regulations and/or has been arrested or convicted of a crime;
>
> (3) Disclosure and disposition of an arrest and/or conviction by an employee to management to verify/validate the information supplied by the employee; and/or
>
> (4) For positions that require a valid commercial or operator's driving license, information that can be corroborated that an employee has been charged with driving infractions that can result or has resulted in revocation or suspension of licensure.

*Id*. at WMATA0002232-33.

The background screening includes information on an individual's arrests, credit report, criminal convictions, driving record, education, employment, and professional licenses and certificates. *Id*. at WMATA0002228. From the beginning, Policy 7.2.3 has included three appendices tied to different categories of jobs: (1) jobs requiring unrestricted access to the general public; (2) fiduciary positions; and (3) all other positions. *Id*. at WMATA0002229. Each appendix lists a number of criminal offenses and whether a felony or misdemeanor

conviction on a particular offense is permanently disqualifying or, in some instances, one conviction in that category is permissible in the last five or ten years. *See, e.g., id.* at WMATA0002235.

Appendix A covers positions requiring access to the general public and lists disqualifying offenses as those crimes against persons and property, sex crimes, controlled substances offenses, societal offenses, and traffic offenses, including "Criminal Mischief." *Id.* The traffic offenses are only "[a]pplicable to positions that require [a] valid . . . [l]icense." *Id.* A felony or misdemeanor conviction of "Kidnapping/Abduction/Unlawful Restraint" will permanently disqualify an applicant. However, while a felony conviction of "Possession of Controlled/Illegal Substances" is permanently disqualifying, one misdemeanor conviction in the last five years is permitted. *Id.* A majority of the listed offenses are permanently disqualifying. *Id.*

Appendix B covers fiduciary positions and includes all the offenses listed in Appendix A except "Criminal Mischief"; it also adds financial crimes. *Id.* at WMATA0002236. A larger number of offenses are permanently disqualifying in Appendix B and a single conviction most often must be older than in Appendix A to permit hire. *Id.* For example, an applicant can only have one misdemeanor conviction of "Possession of Controlled/Illegal Substances" in the last ten years to be eligible for a fiduciary position, rather than five years for public access positions. *Id.*

Appendix C covers all other positions, except MetroAccess, which could include landscapers as well as metro-track repair persons. *Id.* at WMATA0002238. Appendix C includes all the offenses listed in Appendix A, except "Criminal Mischief." *Id.* at WMATA0002238. Fewer offenses in Appendix C are permanently disqualifying than in

Appendix A or B, and where a single conviction is permitted, the time period being reviewed is often shorter than in Appendix A. *Id.* For example, neither a felony nor a misdemeanor conviction for "Possession of Controlled/Illegal Substances" is permanently disqualifying in Appendix C; and it is not disqualifying to have one felony conviction in the last ten years and one misdemeanor conviction in the last five years. *Id.*

Policy 7.2.3 was extended to MetroAccess on January 1, 2013 with the addition of Appendix F. *See* Cert. Opp., Ex. 2, Revised Policy 7.2.3 [Dkt. 137-2] at WMATA0002429. Appendix F includes all of the same offenses listed in Appendix B, but adds "Criminal Mischief." *Id.* Generally, Appendix F has fewer permanently disqualifying offenses and the time period for which a single conviction is permitted is often shorter than in the other Appendices.

Applicants for positions with WMATA and badge contractors undergo initial screening and interviews. Applicants become "candidates" after completing the pre-employment phase, including the "pre-employment assessment and testing, interview and [] receiv[ing] a contingent offer of employment." ██████████████ Candidates' names are forwarded to First Choice Background Screening (First Choice), an outside contractor, to conduct the background check as required by Policy 7.2.3. ██████ If First Choice locates a disqualifying conviction, it mails a letter to the candidate explaining the results and stating that s/he has ten days to dispute the results. After ten days without a response from the candidate, First Choice sends a letter rescinding the contingent offer of employment. ██████████ If a candidate responds to First Choice in a timely manner, s/he may only contest the accuracy of the background check. A candidate may not ask WMATA to make an exception to Policy 7.2.3. ████████████████

MetroAccess candidates follow the same process as WMATA and badge contractors, except for two unique characteristics. First, MetroAccess candidates undergo a criminal background check ███████████████████████████ and a driving record check if applicable, prior to having their names sent to First Choice. Mot. for Cert., Ex. 17, ████████████████████████████████████████████████. Second, MetroAccess candidates have a more formal process to appeal the First Choice results directly to a board of WMATA officials. ██████ ██████████████████████████████████████ However the appeal is still limited to whether the conviction is disqualifying, not whether Policy 7.2.3 should be applied. ██████

B. **Plaintiffs' Claims of Discriminatory Impact**

Plaintiffs claim that Policy 7.2.3 is "overly broad and unnecessarily restrictive because it excludes workers on the basis of convictions that are irrelevant to any fair determination of employee honesty, reliability, or safety." Second Amended Complaint [Dkt. 117-1] ¶ 108 (SAC). Specifically, Plaintiffs criticize the portions of Policy 7.2.3 that treat a single conviction from particular categories of crimes as disqualifying, no matter how old.

Plaintiffs argue that WMATA's failure to connect Policy 7.2.3 to the requirements of its positions has caused a discriminatory impact. Plaintiffs point to a Guidance from the EEOC on the Consideration of Arrest and Conviction Records in Employment Decisions, as amended on April 25, 2012. *See* Mot. for Cert, Ex. 37, EEOC Guidance [Dkt. 124-4]. The Guidance recommends that employers using a criminal background check policy should consider three factors: (1) the nature and gravity of the offense; (2) the time since the conviction and/or completion of a sentence; and (3) the nature of the job sought. *Id*. at 11. The Guidance also recommends an individualized assessment that allows an applicant to explain the

circumstances of a prior offense and to argue that it should not result in a refusal to hire. *Id*. at 18. Plaintiffs argue that Policy 7.2.3 does not permit individualized assessment and prohibits any explanation or argument from the candidate about the circumstances of an offense. First Choice has no discretion in applying Policy 7.2.3 and candidates have no opportunity to appeal other than to argue that the background check contains inaccurate information.

As a result of these features, Plaintiffs argue that Policy 7.2.3 has a disparate impact on African-American candidates.[2] Drs. Farber and Siskin, two of Plaintiffs' experts, have opined that for each category of candidates (WMATA, badge contractors, and MetroAccess), African Americans failed the criminal background check of Policy 7.2.3 at a higher rate than whites and non-African Americans. Plaintiffs argue that the impact is a product of the racial disparities in criminal charges and convictions between African Americans and individuals of other races in the criminal justice system.

C. **Plaintiffs' Proposed Classes**

Plaintiffs' proposed class definition would include "all African-American persons (excluding persons directly employed and subsequently terminated by WMATA) who, since February 23, 2012, have been terminated or otherwise permanently separated from their positions, suspended with or without pay, and/or denied employment with WMATA or any third party contractor or subcontractor as a result of WMATA's Criminal Background Check Policy." SAC ¶ 40. The proposed class is also divided into three "subclasses" as follows:

> **WMATA Candidate Subclass**: All African-American persons who, since February 23, 2012, have been suspended with or without

---

[2] For the sake of clarity the Court will refer to all members of the proposed class as candidates, although the Court recognizes that proposed class members include African-American candidates of WMATA, its contractors and subcontractors, and current employees of WMATA's contractors and subcontractors.

pay, and/or denied employment with WMATA as a result of WMATA's Criminal Background Check Policy.

**MetroAccess Contractor Applicant Subclass**: All African-American persons who, since January 1, 2013, have been terminated or otherwise permanently separated from their positions, suspended with or without pay, denied the ability to work under a WMATA contract, and/or denied employment with any MetroAccess contractor as a result of WMATA's Criminal Background Check Policy.

**Badge Contractor Subclass**: All African-American persons who, since February 23, 2012, have been terminated or otherwise permanently separated from their positions, suspended with or without pay, denied a contractor badge necessary to access WMATA property, denied the ability to work under a WMATA contract, denied the ability to work at or on WMATA property, and/or denied employment with a Badge Contractor as a result of WMATA's Criminal Background Check Policy.

*Id*. ¶ 41.

### D. **Plaintiffs' Proposed Named Plaintiffs**

Plaintiffs identify ten potential named Plaintiffs to represent the proposed classes, *see id*. ¶¶ 20, 53-107, but do not indicate which proposed subclass each named Plaintiff would represent. Plaintiffs make the following allegations regarding the named Plaintiffs:

- Sidney Davis "is a 69-year-old African-American man who is currently employed as a bus operator by WMATA." *Id* ¶ 93. Mr. Davis fears termination if he "takes leave for more than ninety (90) days" because WMATA may use that leave to subject him to Policy 7.2.3, which would disqualify him for the bus operator position due to a 1972 conviction, which was disclosed to WMATA when he was initially hired in 2003. *Id*. ¶¶ 94-95, 97, 99.

- Erick Little "is a 47-year-old African-American man" who "received a contingent offer of employment for a position as a Bus Operator with WMATA," which "was rescinded three weeks later due to the results of his criminal background check." *Id*. ¶¶ 53-54.

- Timothy McClough "is a 57-year-old African-American man" who was terminated from his badge contractor position with a WMATA landscaper "based on a 22-year-old drug-related conviction, despite

11

his successful work as a landscaper and custodian for WMATA for over six years prior to his firing." *Id.* ¶ 63.

- Leon McKenzie "is a 52-year-old African-American man" who was "disqualified for a job as a bus driver at WMATA based on a drug-related conviction from 1995." *Id.* ¶ 80.

- Louia McKenzie "is a 47-year-old African-American man" who was "denied a position as a MetroAccess operator at First Transit . . . based on convictions more than 20 years old." *Id.* ¶ 87. Mr. McKenzie had previously been employed by MV Transportation, an earlier WMATA contractor, but was released when that contractor lost its contract with WMATA. *Id.* ¶ 88.

- Leroy Quarles "is a 53-year-old African-American man" who was "fired from his job at Diamond[, a MetroAccess contractor,] as a WMATA MetroAccess driver/operator based on a 25-year-old conviction for assault and robbery . . . , despite his successful work at MetroAccess for over three years prior to his firing." *Id.* ¶ 70. Diamond attempted to appeal the application of Policy 7.2.3 to Mr. Quarles, but was ultimately unsuccessful and Mr. Quarles was terminated. *Id.* ¶ 73.

- Fitzgerald Stoney "is a 62-year-old African-American man" who was "denied a job as a mechanic technician for a WMATA contractor based on convictions that are decades old." *Id.* ¶ 75.

- Gerald Tucker "is a 35-year-old African-American man" who was "denied reinstatement by WMATA for his job as a train operator based on a nine-year-old misdemeanor weapons charge . . . , despite his successful work as a WMATA bus and train operator for over five years prior to the denial of reinstatement." *Id.* ¶ 66.

- Marcello Virgil "is a 45-year-old African-American man" who was "fired from his job as a custodian with a WMATA contractor based on a drug-related conviction that was 15 years old, even though he disclosed the conviction before he started work." *Id.* ¶ 100.

- Lawrence Whitted "is a 58-year-old African-American man" who was terminated from his position with "Diamond as a WMATA MetroAccess driver/operator based on a 24-year-old drug-related

conviction, despite his successful work at MetroAccess for over five years prior to his firing." *Id.* ¶ 59.[3]

Based on these allegations, the Court notes which Appendix likely applied to each proposed class representative, to the extent it is evident. Messrs. Little, Tucker, Leon McKenzie, Davis, and Virgil allege they applied for and were not hired for positions covered by Appendix A, that is, positions with access to the general public. Messrs. Stoney and McClough appear to have either applied and not been hired for, or fired from, a position covered by Appendix C, that is, a position without access to the general public or involving fiduciary/financial responsibilities. Messrs.Whitted, Leroy Quarles, and McKenzie allege they applied and were not hired for positions with MetroAccess contractors covered by Appendix F.

## II. LEGAL STANDARD

### A. Admissibility of Experts

Federal Rule of Evidence 701 governs opinion testimony by lay witnesses, who may testify only as to opinions that are "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. However, expert witnesses testify based on specialized knowledge and can express opinions. As Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

---

[3] The Court notes Plaintiffs' Second Amended Complaint removed Messrs. Davis and Whitted as class representatives, but due to the redefinition of the classes as certified Messrs. Davis and Whitted will remain pending a revised motion to amend.

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Court serves as a gatekeeper for expert testimony. Rule 702 imposes a "special obligation upon a trial judge" to ensure that expert testimony is not only relevant, but reliable. *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). The presumption is that expert testimony is admissible, so that once a proponent has made the requisite threshold showing, further disputes go to weight, not admissibility. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993). "Under *Daubert*, the district court is required to address two questions, first whether the expert's testimony is based on 'scientific knowledge,' and second, whether the testimony 'will assist the trier of fact to understand or determine a fact in issue.'" *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1126 (D.C. Cir. 2001) (citing *Daubert*, 509 U.S. at 592). The first inquiry "demands a grounding in the methods and procedures of science, rather than subjective belief or unsupported speculation." *Id.* at 1127; *see also Daubert*, 509 U.S. at 592-93 (requiring a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue"). The second inquiry "goes primarily to relevance." *Daubert*, 509 U.S. at 591.

There are four factors that a court may consider in evaluating scientific validity under *Daubert*:

(1) whether the theory or technique can be and has been tested;

(2) whether the theory or technique has been subjected to peer review and publication;

(3) the method's known or potential rate of error; and

(4) whether the theory or technique finds general acceptance in the relevant scientific community.

*Ambrosini v. Labarraque*, 101 F.3d 129, 133-34 (D.C. Cir. 1996) (citing *Daubert*, 509 U.S. at 593-94).  Ultimately, "the inquiry is a 'flexible one'"; no one factor is dispositive, and the four-factor list is not exhaustive.  *Id.* (quoting *Daubert*, 509 U.S. at 593-95).

The Court has "latitude . . . to decide whether or when special briefing or other proceedings are needed to investigate reliability."  *Kumho Tire*, 526 U.S. at 152.  "District courts are not required to hold a *Daubert* hearing before ruling on the admissibility of scientific evidence."  *In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1138-39 (9th Cir. 2002) (citing *United States v. Alatorre*, 222 F.3d 1098, 1100 (9th Cir. 2000); *accord Oddi v. Ford Motor Co.*, 234 F.3d 136, 154 (3d Cir. 2000) ("[T]he district court already had before it the depositions and affidavits of the plaintiff's experts.  Nothing more was required.").  "Thus, a trial court properly may exercise its discretion to forego a formal pretrial hearing outside the presence of the jury. . . .  [W]here the dispute is easily resolved, no hearing, in limine or otherwise, should be necessary."  29 Wright & Miller, *Federal Practice & Procedure: Evidence* § 6266 (1st ed. & Supp.).  "However, one aspect of the necessary procedure is clear:  the trial court should identify for the record the factors bearing on reliability that it relied upon in reaching a determination."  *Id.*

**B.  Class Certification**

Federal Rule of Civil Procedure 23 governs class certification.  A party seeking class certification must first demonstrate that the class satisfies the requirements of Rule 23(a), that:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In addition to meeting the above requirements, a class must satisfy at least one of the three subsections of Rule 23(b). Plaintiffs in this case seek certification under subsections (b)(2) and (b)(3). Rule 23(b)(2) applies to cases where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(3) is satisfied when the proposed class demonstrates that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). When evaluating a proposed class under (b)(3) a court must consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

*Id.*

To the extent individual determinations are necessary in a Title VII class action to allow a defendant to present individual defenses or calculate individual damages, the court can

conduct individual *Teamsters* hearings after general liability has been established. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977). "When the plaintiff seeks individual relief such as reinstatement or backpay after establishing . . . discrimination, 'a district court must usually conduct additional proceedings . . . to determine the scope of individual relief.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 366 (2013) (quoting *Teamsters*, 431 U.S. at 361). The Court may also "exercise its discretion under Rule 23(c)(4) to isolate the liability and injunctive relief questions, certify a single class under Rule 23(b)(2) to address those issues, and leave damages calculations for individualized hearings." *Houser v. Pritzker*, 28 F. Supp. 3d 222, 241 (S.D.N.Y. 2014). Rule 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4).

When evaluating a motion for class certification, a court should not consider the underlying merits of the plaintiffs' claims. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974) (when "determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met").

## C. Leave to Amend a Complaint

Rule 15 of the Federal Rules of Civil Procedure governs the filing of amended pleadings, such as a complaint, after a responsive pleading has been filed. *See* Answer [Dkt. 89]. As relevant here, it specifies that "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The grant or denial of leave lies in the sound discretion of the district court. *See Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996). A court may deny leave to amend with sufficient reason, such as futility of amendment, undue delay, bad

faith, dilatory motive, undue prejudice, or repeated failure to cure deficiencies by previous amendments.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

### III.  ANALYSIS[4]

#### A.  Admissibility of Expert Opinions

As is almost customary these days, all parties move to exclude the proposed expert witnesses of the opponent.  The Court will grant in part and deny in part WMATA's motion to exclude Dr. Farber; grant WMATA's motion to exclude Dr. Bendick; grant in part and deny in part Plaintiffs' motions to exclude Dr. Stixrud's initial report and declaration; and deny WMATA's motion to exclude Dr. Siskin's report.

##### 1.  Dr. Henry Farber

"Disparate impact claims . . . 'involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.'"  *Anderson v. Zubieta*, 180 F.3d 329, 338 (D.C. Cir. 1999) (quoting *Teamsters*, 431 U.S. at 336).  A plaintiff can establish disparate treatment by offering "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group."  *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 994 (1988).  At this juncture, the Court analyzes Plaintiffs' allegations and not WMATA's defenses or business justifications.

---

[4] The Court has jurisdiction over Plaintiffs' Title VII claims under 28 U.S.C. §§ 1331 and 1342 and 42 U.S.C. § 2000e-16(c) and supplemental jurisdiction over the DCHRA claims under 28 U.S.C. § 1367(a).  Title VII is a law of the United States, which gives original jurisdiction to the federal district courts.  Venue is proper in this Court because the events took place in Washington, D.C. and the WMATA Compact specifies the United States District Court for the District of Columbia as the proper venue for litigation of disputes against WMATA.  *See* WMATA Compact, D.C. Code § 9-1107.01 (81).

Dr. Farber has been a Professor of Economics at Princeton University since 1991. He received his Ph.D. in economics from Princeton University in 1977. His scholarship and teaching focus on labor economics and econometrics. Dr. Farber has provided expert reports and testified as an expert in a number of previous cases, including Title VII cases. *See* Mot. to Exclude Farber, Ex. 1, Farber Rep. [Dkt. 138-1] ¶ 1.

Dr. Farber's reports address his analysis of whether African Americans have been disparately impacted by Policy 7.2.3. Dr. Farber conducted three separate analyses, using overlapping data sets. First, Dr. Farber determined the difference in passage rates under Policy 7.2.3 between African Americans and other individuals, ███████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████ *See* Mot. for Cert., Ex.1, [Dkt. 124-1] ██████████████; Farber Rep. ¶¶ 17, 35-50. Secondly, Dr. Farber conducted the same analysis using the data provided by WMATA ████████████████████████████ ███████████████████████████████████████████████████████████████ ██████.[5] *See* Farber Rep. ¶¶ 51-59. Finally, Dr. Farber used "a standard statistical procedure known as a 'probit analysis' to predict the probabilities of each individual's race based on geographic location of residence and last name and then use[d] this information to estimate the rates at which African Americans and members of the comparison groups failed the criminal background check." *Id.* ¶ 60.

---

[5] Dr. Farber updated this analysis on two subsequent occasions as more data became available from WMATA and its contractors. *See* Mot. to Exclude Farber, Ex. 2, Farber Rebuttal [Dkt. 138-1]; *id.*, Ex. 3, Farber Supp. [Dkt. 138-1]. The Court notes that WMATA had and provided race data on its candidates and employees and MetroAccess's candidates and employees, but does not have complete race data ████████████ of badge contractors who are employed by WMATA contractors.

WMATA moves to exclude Dr. Farber's expert report, rebuttal report, supplemental report, and testimony for the following reasons: (1) the report will not aid the trier of fact as required by Rule 702(a); and (2) Dr. Farber's opinions are not based on sufficient data or accepted methods of determining the relevant issue as required by Rule 702(b), (c), and (d).[6] *See* Mot. to Exclude Farber [Dkt. 138]. As support for its arguments, WMATA repeats points ████████████████████████████████████████████, discussed below, which challenges the validity of Dr. Farber's analyses and reports.

*Relevance.* WMATA argues that Plaintiffs must challenge the usefulness or impact of each individual conviction type evaluated by Policy 7.2.3. *See* Mot. to Exclude Farber at 15-21. On this basis, it contends that Dr. Farber fails to satisfy the requirements of Rule 702(a) that the expert information be useful to the trier of fact. WMATA takes issue with Plaintiffs' attempt to construct classes based on the individual's employer or by whom s/he sought to be employed, arguing that the analysis should pertain to the disqualifying effect of each type of conviction, and that each type of evaluated conviction comprises a separate class.[7] Plaintiffs argue that Dr. Farber's report is relevant and useful to the trier of fact's determination of disparate impact. Farber Opp. [Dkt. 161] at 29-30.

---

[6] The Court notes that WMATA makes a number of other arguments, but they all go to the weight that should be given Dr. Farber's analysis and whether his opinions are ultimately sufficient to prove a disparate impact. While these arguments may be useful on summary judgment or at trial, they are not relevant to the relevance or reliability of Dr. Farber's expert testimony.

[7] WMATA argues both that each conviction evaluated by Policy 7.2.3 should be considered separately as to its impact and that a disparate impact study must also pertain separately to each "position in question." 42 U.S.C. § 2000e-2(k)(1)(A)(i); *see also* Mot. to Exclude Farber at 19-20. However, the latter argument challenges the merits of Plaintiffs' disparate impact claim and the relative weight Dr. Farber's analysis should be given by a fact finder, not whether it is admissible.

The dispute is a question of relevance. Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed. R. Evid. 401. Rule 702 specifies that if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, expertise, training, or education, may testify thereto in the form of an opinion or otherwise. *See* Fed. R. Evid. 702. WMATA makes no argument about Dr. Farber's expertise or qualifications, but instead focuses on the relevance of his report, alleging that it interpreted an incorrect aspect of the data, namely the employer—WMATA, MetroAccess, or badge contractor—rather than the type of position and conviction considered.

The Court finds that whether Policy 7.2.3 had a disparate impact is a relevant issue to the trier of fact but that Dr. Farber's current analysis in its entirety lacks sufficient basis to be admissible in determining that issue. Much of Dr. Farber's analysis is focused on class distinctions that will not be certified and is therefore irrelevant. However, Dr. Farber's analysis of MetroAccess is consistent with the classes defined and certified below and will be admitted. The remainder of Dr. Farber's analysis will be excluded as irrelevant to the classes as they are certified by this Court.

*Reliability.* WMATA argues that Dr. Farber's reports and testimony fail to satisfy Rule 702(b), (c), and (d) because (1) Dr. Farber's methodology of determining race has never been used before in a Title VII case, even by Dr. Farber himself; and (2) Dr. Farber did not have sufficient race data upon which to base his opinions, especially from badge contractors, and as a result used improper aggregated data. Because the Court has already excluded all but Dr. Farber's analysis of MetroAccess candidates and employees, it need not address the issue of

21

reliability.  WMATA's challenges of reliability go only to Dr. Farber's analysis of the badge contractor proposed class, which will not be admitted.

The Court will admit Dr. Farber's analysis of the MetroAccess class and exclude all other analyses as irrelevant.

### 2.  Dr. Marc Bendick, Jr.

WMATA moves to exclude the expert report of Dr. Marc Bendick, Jr. on the grounds that it was not based on reliable principles or methods and required no scientific or specialized knowledge to produce.  Mot. to Exclude Bendick [Dkt. 132].  WMATA argues that Dr. Bendick simply created an excel spreadsheet into which individual information from each class member could be placed to determine individual damages and overall class-wide damages could be determined by summing all individual determinations.  *Id*. at 8-11.  Because Dr. Bendick's expert report provides no method to calculate class-wide damages without first making individual determinations, WMATA argues the report does not resolve a necessary issue for class certification and should be excluded.  *Id*. at 15-17.

Plaintiffs respond that Dr. Bendick's report developed a proposed damages methodology based on reliable labor economic principles, *see* Bendick Opp. [Dkt. 153] at 6-11, and was focused on the feasibility of computing damages for the class, rather than the per person computation, because, per Court order, damages discovery is scheduled to begin after a decision on class certification.  *Id*. at 11-12.  Due to the Court's order, Dr. Bendick focused his report on determining the best way to calculate backpay and the potential sources which could be utilized to determine damages for individuals where evidentiary support is lacking.  *See id*.

As discussed below, the Court will not certify a Rule 23(b)(3) class for monetary damages, but will instead conduct individual *Teamsters* hearings if the action proceeds past the

liability phase.  Dr. Bendick's report is, therefore, unnecessary at this stage in the litigation and WMATA's motion to exclude will be granted.

In addition, Dr. Bendick's report fails to propose a method by which the Court or a fact finder could determine class-wide damages without first computing the individual damages of each class member and then engaging in basic math to add them up.  In order to certify a class under Rule 23(b)(3), Plaintiffs must present a reasonable theory for computing class-wide damages.  Plaintiffs disagree, citing *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016), and *Coleman v. District of Columbia*, 306 F.R.D. 68, 86-87 (D.D.C. 2015).  Neither case is helpful to Plaintiffs' argument that a plan to merely add up individual damages to determine class-wide damages is acceptable under Rule 23(b)(3).  The *Bouaphakeo* Plaintiffs used statistical sampling to extrapolate class-wide damages, rather than conducting individualized damages calculations.  *See* 136 S. Ct. at 1044-49.  Plaintiffs here do not propose sampling.

The *Coleman* Plaintiffs used a common formula provided by D.C. law for use in calculating class damages and the data existed in a common pool, making individual damages determinations relatively simple.  *See* 306 F.R.D. at 86-87.  That would not be the case here. Each successful class member would need to be evaluated independently to determine at a minimum the position applied for, the date applied, the date denied the position, whether the hiring entity had a reason (separate from Policy 7.2.3) for failing to hire the individual, the salary for the position, the benefits, the retention rate, and whether the individual mitigated damages by finding another job.  Because WMATA required that all contractors and subcontractors also use Policy 7.2.3, the data that may be necessary to calculate individual damages is not housed solely with WMATA and individual class members.  Each contractor and subcontractor may need to

provide information about its hiring process for class members and data to compute each individual's potential damages.

Because the Court will not certify a Rule 23(b)(3) class, Dr. Bendick's computation of damages is not relevant and will be excluded.

### 3. Dr. Jora Stixrud

Plaintiffs argue that the report and declaration of Dr. Jora Stixrud should be excluded because she failed to present expert opinions that are supported by methods or principles that can be tested. Rather, Plaintiffs argue, Dr. Stixrud merely critiqued Dr. Farber's report and reached blanket conclusions that his findings are inaccurate. Plaintiffs contend that Dr. Stixrud cannot merely rely on her expertise and experience to opine that Dr. Farber's opinions are unreliable. *See* Mot. to Exclude Stixrud Rep. [Dkt. 135]. WMATA emphasizes that Dr. Stixrud will be presented as a pure rebuttal expert and not a merits expert. Thus, Dr. Stixrud's role is to "poke holes," not provide an alternative method to assess Policy 7.2.3. *See* Stixrud Opp. [Dkt. 157]. WMATA contends that Dr. Stixrud properly relies on her expertise and experience in her anticipated role, as she has explained in a declaration attached to WMATA's opposition. ███████████████████████████ Plaintiffs also move to exclude Dr. Stixrud's declaration, citing the same deficiencies in support and evidence to justify her opinions and lack of timely notice.[8] Mot. to Exclude Stixrud Decl. [Dkt. 162]. WMATA responds that

---

[8] Federal Rule of Civil Procedure 26(a)(2) governs the disclosure of expert testimony and requires disclosure either 90 days before trial or, if intended as rebuttal, 30 days after the other party's submission. Fed. R. Civ. P. 26(a)(2)(D). Rule 26(a)(2)(E) permits supplemental disclosures when required under Rule 26(e). Fed. R. Civ. P. 26(a)(2)(E). Under Rule 26(e) parties must supplement disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect," and specifically with respect to experts, the duty to disclose extends to the expert's report and deposition and must be made "by the time the party's pretrial disclosures" are due. Fed. R. Civ. P. Rule 26(e). Finally, Rule 37(c)(1) governs the remedy if an improper disclosure occurs, mandating the exclusion of the

Dr. Stixrud's declaration offers no new conclusions, but instead reaffirms previously disclosed opinions and offers additional support. Stixrud Decl. Opp. [Dkt. 175]. The Court will address both motions together.

While it is not always necessary that an expert rely on scientific or technical knowledge to be admissible and provide reliable and useful evidence to a trier of fact, a federal court serves a "gatekeeping" function when reviewing reports and proposed testimony of non-scientific experts. *Kumho Tire,* 526 U.S. at 141; *see also Daubert*, 509 U.S. 579. An expert witness with experience relevant to a pertinent issue in a case may opine and testify about the reliability of another expert's report or testimony. *See Kumho Tire*, 526 U.S. at 156 (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience"). However, the Advisory Committee Notes accompanying the 2000 amendments of Federal Rule of Evidence 702, which deals with the admission of expert testimony, explain that

> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it." . . . The more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable.

Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702; *see also Twin Cities Bakery Workers Health & Welfare Fund v. Biovail Corp.*, No. 01-2197, 2005 WL 3675999, at *4 (D.D.C. Mar. 31, 2005), *aff'd sub nom. Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857 (D.C. Cir. 2008). The Ninth Circuit also recognized that a court must do more than "take the expert's word

---

supplemental information "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

for it."  *See Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability.  Under *Daubert*, that's not enough.").

Taking both Dr. Stixrud's initial report and declaration together, the Court finds that Dr. Stixrud has the experience and qualifications necessary to critique Dr. Farber and adequately explains the reasons behind her criticisms of Dr. Farber's report.  The Court also finds that the delay in disclosing of Dr. Stixrud's declaration was harmless.  Plaintiffs will have the opportunity during the merits phase to delve further into Dr. Stixrud's critiques and evaluate any additional support offered by the supplemental declaration.

Plaintiffs also specifically move to exclude all portions of Dr. Stixrud's report which render legal conclusions.  Plaintiffs note two allegedly legal opinions in Dr. Stixrud's report:  (1) the relevance of Dr. Farber's report; and (2) the lack of foundation for Dr. Farber's opinions.  Mot. to Exclude Stixrud at 2-3.  WMATA argues that the "legal conclusions" identified by Plaintiffs are not legal conclusions, but instead "opinions on the technical and methodological flaws in Dr. Farber's studies."  Stixrud Opp. at 13.  It is well established that experts may not express legal opinions or opinions about whether a legal standard has been satisfied.  *See, e.g., Burkhart v. WMATA*, 112 F.3d 1207, 1212 (D.C. Cir. 1997) ("Expert testimony that consists of legal conclusions cannot properly assist the trier of fact in either respect, and thus it is not otherwise admissible."); *United States ex rel. Mossey v. Pal–Tech, Inc.*, 231 F. Supp. 2d 94, 98 (D.D.C. 2002) ("[E]xpert testimony consisting of legal conclusions will not be permitted because such testimony merely states what result should be reached, thereby improperly influencing the decisions of the trier of fact and impinging upon the responsibilities of the court.").  An expert may, however, "give h[er] opinion as to facts that, if found, would

support a conclusion that the legal standard at issue" was or was not satisfied. *Rothe Dev., Inc. v. Dep't of Def.*, 107 F. Supp. 3d 183, 200 (D.D.C. 2015).

The Court finds that Dr. Stixrud's statements about the relevance of or foundation for Dr. Farber's opinions are not permissible expert opinions. Contrary to WMATA's arguments, those statements do not discuss the technical or methodological aspects of Dr. Farber's opinion, or give Dr. Stixrud's opinion as to facts, but instead state her conclusions that a legal standard is not met. Dr. Stixrud will not be permitted to advance legal conclusions or opinions on the law at issue in this case. Any opinions or portions of Dr. Stixrud's report or declaration rendering a legal opinion will be stricken. The Court will grant in part and deny in part Plaintiffs' motions to exclude Dr. Stixrud's initial report and declaration.

### 4. Dr. Bernard R. Siskin

WMATA moves to strike the report and testimony of Dr. Bernard R. Siskin as untimely and improper rebuttal to WMATA's expert, Dr. Jora Stixrud. WMATA argues that Dr. Siskin presents "a new and alternative statistical methodology" and was only disclosed as an expert on May 3, 2016, the same day Plaintiffs filed their Motion for Class Certification. Mot. to Exclude Siskin [Dkt. 139] at 1. Dr. Siskin critiques Dr. Stixrud's report and uses Bayesian Improved Surname Geocoding (BISG) to estimate the number of African Americans in the various data sets. He concludes that Policy 7.2.3 has a statistically significant disparate impact on African-American candidates. *See id.*, Ex. 1, Siskin Rep. [Dkt. 139-1] ¶¶ 5, 11-19. WMATA argues that Dr. Siskin is not a rebuttal expert, but rather an expert in support of class certification and should, therefore, have been disclosed much sooner. *See* Mot. to Exclude Siskin at 3-6. Because Dr. Stixrud, WMATA's expert, did not propose her own statistical model, WMATA argues that Dr. Siskin's new statistical model is not rebuttal to Dr. Stixrud but, rather, a rebuttal

to Plaintiffs' own expert, Dr. Farber. *Id.* at 3-4. WMATA stresses that Dr. Stixrud is not a merits expert. Therefore, a rebuttal expert focused on the merits is not proper rebuttal.[9]

Plaintiffs respond that Dr. Siskin's report was timely and is proper rebuttal to Dr. Stixrud because it refutes her statement that it is "impossible to draw meaningful conclusions," Stixrud Rep. at 7, on disparate impact from the data provided by WMATA and its contractors and subcontractors. Siskin Opp. [Dkt. 160] at 7-11. Specifically, Plaintiffs argue that any additional methodology which calculates disparate impact using the aforementioned data refutes Dr. Stixrud's conclusion that such activity is impossible. *Id.* at 8. Dr. Siskin uses an alternative method to determine disparate impact and demonstrate the "possibility" of that type of analysis.

At the parties' joint request, the Court extended the deadline for Motions for Class Certification and replies to expert disclosures to May 3, 2016. *See* 4/28/2016 Minute Order. Plaintiffs disclosed Dr. Siskin's report on May 3, 2016. Expert rebuttal testimony "is intended solely to contradict or rebut evidence on the same subject matter identified by another party." Fed. R. Civ. P. 26(a)(2)(D)(ii). Dr. Stixrud's expert report contained no evidence or methodology on the issue of disparate impact. Instead, as discussed above, Dr. Stixrud focused on statements aimed at undermining Dr. Farber's conclusions. Her expert report contained no independent assessment of disparate impact and presented no alternative theory. Under a strict construction of Rule 26(a)(2)(D)(ii) where an expert report contains no affirmative evidence, no rebuttal may be permitted.

However, the D.C. Circuit has found that a district court has "broad discretion in determining whether to admit or exclude expert testimony" and no *per se* rule exists that new

---

[9] WMATA also requests the opportunity to depose and test Dr. Siskin's theory and file a supplemental motion to exclude based on Rule 702 and *Daubert*. *Id.* at 7-8.

expert testimony is inappropriate rebuttal testimony. *United States v. Gatling*, 96 F.3d 1511, 1523 (D.C. Cir. 1996). District courts routinely permit new experts for rebuttal purposes and permit rebuttal experts to use new methodologies to rebut the opinions of the opposing expert. *See, e.g., South Carolina v. United States*, No. 12-203, 2012 WL 11922224, at *2 (D.D.C. Aug. 15, 2012) (permitting the use of a new expert on rebuttal); *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33 (S.D.N.Y. 2016) (permitting the use of a new expert and new methodology on rebuttal); *see also* Siskin Opp. at 8 (collecting cases).

Although Dr. Siskin's report does not meet the definition of rebuttal testimony, the Court finds no harm or prejudice to its introduction at this stage in the litigation. WMATA indicates that it would like the opportunity to depose Dr. Siskin and consider challenging the admissibility of Dr. Siskin's report under Rule 702 and *Daubert*. The Court agrees that if Plaintiffs wish to rely on Dr. Siskin's report in the merits phase of the case, they must identify Dr. Siskin as a merits expert and allow for a deposition. The Court will, therefore, deny WMATA's motion to exclude Dr. Siskin's report.

### B. Class Certification

Rule 23 of the Federal Rules of Civil Procedure controls class certification. Plaintiffs move for certification under Rule 23(a), (b)(2), and (b)(3) (or alternatively (c)(4)), and request appointment of Plaintiffs' counsel as class counsel under Rule 23(g).

Rule 23 provides that a class seeking certification must meet the four requirements of subsection (a), as well as at least one of the requirements of subsection (b). Rule 23(a) requires a class to show sufficient numerosity, commonality, typicality, and adequacy of the proposed class, as well as adequacy of the proposed class counsel. Fed. R. Civ. P. 23(a). Plaintiffs move for a hybrid class under Rule 23(b)(2) and (b)(3). Rule 23(b)(2) requires

plaintiffs to show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(3) requires a showing that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). A party satisfies (b)(3) by demonstrating that issues common to the class predominate over individual issues and proceeding as a class will be both efficient and fair.

Plaintiffs contend that Policy 7.2.3 has been enforced by WMATA through a centralized process that is uniformly and consistently applied to job candidates applying to WMATA, its contractors, and MetroAccess. Plaintiffs further allege that Policy 7.2.3 "has an unjustified discriminatory effect on African Americans . . . [that] raises a common, class-wide question." Mem. in Supp. of Mot. for Cert. [Dkt. 124-1] at 1. Plaintiffs seek a declaration that Policy 7.2.3 has a disparate impact and an injunction preventing WMATA and its contractors and subcontractors from applying Policy 7.2.3 further. Finally, Plaintiffs assert that individual damages can be efficiently resolved on a class-wide basis as a hybrid class, *see Eubanks v. Billington*, 110 F.3d 87, 96 (D.C. Cir. 1997), or through *Teamsters* hearings. *See* 431 U.S. at 360.

WMATA responds that the First Amended Complaint targets only criteria that: (1) permanently disqualify for felony drug convictions for certain positions; (2) permanently disqualify for misdemeanor or felony convictions for possession a weapon during the commission of a crime for all job positions; (3) permanently disqualify for felony convictions for certain violent crimes for all job positions; and (4) permanently disqualify for two misdemeanor

convictions in the last five years or two felony convictions in the last ten years for certain property crimes for all positions. Cert. Opp. at 4 (citing FAC ¶ 11). WMATA argues that Policy 7.2.3 distinguishes among crimes and time periods to establish more than 150 criteria for evaluation of criminal background, type of crime, and position sought.

Plaintiffs retort that Policy 7.2.3 is a single, uniform hiring policy or set of criteria that WMATA and its badge contractors have applied to all candidates since February 23, 2012; and MetroAccess has applied to all candidates since January 1, 2013.

Plaintiffs move for certification under a hybrid Rule 23(b)(2) and (b)(3) class, seeking both injunctive and individual monetary damages for the alleged discriminatory policy. Alternatively, if the Court determines monetary damages are not suitable for class-wide determination, Plaintiffs propose certification under (b)(2) for liability and injunctive relief determinations and the application of (c)(4) to allow the question of liability to be answered on a class-wide basis, but individual *Teamsters* hearings on the damages owed to each specific class member. The Court finds that certification is proper under Rule 23(b)(2) and (c)(4) and will certify the three classes defined below for a determination of liability and injunctive relief under (b)(2), but will withhold any individual damages determinations until *Teamsters* hearings.

### 1. Fed. R. Civ. P. 23(a)

#### a. Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity does not "impose[] [an] absolute limitation[]," but rather "requires examination of the specific facts of each case." *Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980). It is generally accepted by courts in this District that numerosity is satisfied and that joinder is impracticable where a proposed class has at least forty members. *See Cohen v. Chilcott*, 522 F. Supp. 2d 105, 114 (D.D.C. 2007); *Bynum*

*v. District of Columbia*, 214 F.R.D. 27, 32-33 (D.D.C. 2003).  Plaintiffs also need not provide the exact number of potential class members to satisfy the requirement, but can provide an estimate supported by a reasonable basis to believe it is accurate.  *Bynum*, 214 F.R.D. at 32-33; *Pigford v. Glickman*, 182 F.R.D. 341, 347-48 (D.D.C. 1998).

Plaintiffs state that the overall class includes over 1000 individuals; the WMATA direct candidates subclass includes approximately 310 individuals; the badge contractor subclass includes approximately 210 individuals; and the MetroAccess contractor subclass includes approximately 535 individuals.  WMATA does not dispute the numbers and makes no arguments against numerosity in its opposition to class certification.  The proposed class and subclasses clearly contain sufficient numbers to make joinder impracticable and satisfy the numerosity requirement of Rule 23(a)(1).[10]

### b. Commonality

Rule 23(a)(2) requires that there be questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2).  "Commonality requires the plaintiff[s] to demonstrate that the class members 'have suffered the same injury.'"  *Wal-Mart*, 564 U.S. at 349-50 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)).  Plaintiffs' "claims must depend up on a common contention . . . capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. at 350.  "A plaintiff's burden is to 'bridge the gap' between her individual claim and 'the existence of a class of persons who have suffered the same injury as that individual.'"  *Moore v. Napolitano*, 926 F. Supp. 2d 8, 29 (D.D.C. 2013) (quoting *Falcon,* 457 U.S. at 157).

---

[10] Even as redefined, the Court finds numerosity of the three distinct classes.

In a Title VII case, a proposed class may have sufficient commonality if they posit a systematic act or overarching process or procedure that is the cause of their harm, even if the specific harm to each class member might be different, such as the specific position lost or the amount of backpay owed. *See Bynum*, 214 F.R.D. at 33-34; *see also Wal-Mart*, 564 U.S. at 353 (finding "significant proof that an employer operated under a general policy of discrimination conceivably could justify a class of both applicants and employees if the discrimination manifested itself in hiring and promotion practices in the same general fashion"). Commonality is established when "harm alleged by each class member was the result of the same corporate-wide policies," because a question common to all members will be whether that policy was unlawful. *DL v. District of Columbia*, 713 F.3d 120, 127 (D.C. Cir. 2013).

Plaintiffs argue the proposed class meets the commonality standard because it challenges a single, non-discretionary employment policy that was applied to all members of the class. Despite the fact that Plaintiffs applied to work for WMATA directly or to work for different MetroAccess and badge contractors that provide services to WMATA, they argue the common question of discriminatory impact can be answered as to all class members because Policy 7.2.3 was applied universally to all candidates. Specifically, WMATA mandated its use for all WMATA employees and badge contractors when the Policy originally came into effect in February 2012, and expanded it to MetroAccess on January 1, 2013. WMATA does not dispute commonality.

As discussed above, Policy 7.2.3 contains separate Appendices indicating the types and ages of convictions that prohibit an individual from gaining employment in a particular job category. The Appendices cover positions that are public facing, involve financial work, MetroAccess positions, and all other positions. All positions within WMATA and its contractors

and subcontractors are covered by Policy 7.2.3. Policy 7.2.3 is applied with no method to appeal except for the inaccuracy of a report. There is no space for individual candidates to explain or mitigate the findings in the Policy 7.2.3 background check; and contractors or subcontractors may not override the results to hire a candidate to work on WMATA property.

The Court finds that the question of whether an Appendix from Policy 7.2.3 has an unjustified disparate impact on African-American candidates for employment with WMATA or its contractors is a common question, the answer to which will resolve a significant question as to the entire class. The fact that candidates applied for positions with different contractors, subcontractors, or WMATA directly does not affect the commonality of the question because Policy 7.2.3 was mandated by WMATA for non-discretionary application to all hiring decisions. The commonality requirement of Rule 23(a)(2) is, therefore, satisfied.

### c. Typicality

Rule 23(a)(3) requires a finding that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement aims at ensuring "'that the class representatives have suffered injuries in the same general fashion as absent class members.'" *In re Vitamins Antitrust Litig.,* 209 F.R.D. 251, 260 (D.D.C. 2002) (quoting *Thomas v. Albright*, 139 F.3d 227, 228 (D.C. Cir. 1998)). The typicality requirement is satisfied "'if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability.'" *In re Lorazepam & Clorazepate Antitrust Litig.,* 202 F.R.D. 12, 27 (D.D.C. 2001) (quoting *Pigford,* 182 F.R.D. at 349). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to

a claim of another class member's where his or her claims are based on the same legal theory." *Stewart v. Rubin,* 948 F. Supp. 1077, 1088 (D.D.C. 1996), *aff'd,* 124 F.3d 1309 (D.C. Cir. 1997).

In employment discrimination class actions, typicality and commonality "tend to merge." *Falcon*, 457 U.S. at 157 n.13. "Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.* Factual variations between the claims of class representatives and the claims of other class members do not negate typicality. *See Wagner v. Taylor,* 836 F.2d 578, 591 (D.C. Cir. 1987) (noting that "typicality is not destroyed merely by factual variations").

Plaintiffs argue that typicality is satisfied because each class member's claim arises from the application of Policy 7.2.3 to his or her candidacy and subsequent denial of employment. Additionally, each class member claims Policy 7.2.3 had a disparate impact due to his/her race. WMATA argues typicality cannot be met because (1) some named plaintiffs were disqualified from employment for legitimate, non-discriminatory reasons and (2) each named plaintiff's disqualification arose under a different screening criteria in Policy 7.2.3 and will require individual evaluation to determine if the particular screening criteria at issue for each plaintiff has a discriminatory impact.

Although WMATA argues it has person-specific legitimate non-discriminatory defenses for its decisions not to hire, limited factual distinctions between class members does not destroy typicality. Plaintiffs' claims are typical if they arise from the same course of events—the application of Policy 7.2.3—and class members make similar legal arguments—Policy 7.2.3 has a disparate impact on African-American candidates. Clearly, Plaintiffs have done just that.

Defenses specific to individual plaintiffs will have "little if any relevance to the outcome" of the overall, but not specific, "liability and injunctive relief phases" of this litigation. *Houser*, 28 F. Supp. 3d at 248; *see also Johnson v. District of Columbia*, 248 F.R.D. 46, 53 (D.D.C. 2008) (finding that typicality was satisfied because all class members were subject to blanket searches prior to presentment, even though the "circumstances of the strip searches may have varied by some degree"); *Bynum*, 214 F.R.D. at 35 (finding typicality was satisfied because all injuries of all named plaintiffs arose from the same conduct, despite the fact that the injuries themselves were not identical as the lengths of each individuals' detention varied).

WMATA also argues that each prior conviction that First Choice screens for constitutes a separate aspect of Policy 7.2.3 and must be assessed individually. Plaintiffs, however, perceive Policy 7.2.3 as a single construct that applies to each class member, suggesting that each class representative is "typical" of the rest of the class. Alternatively, Plaintiffs suggest dividing the proposed class by the part of WMATA for which the individual worked or applied: WMATA, badge contractors, or MetroAccess. While the Court does not agree with WMATA that each conviction must be evaluated separately, it also does not agree with Plaintiffs that Policy 7.2.3 applies in its entirety to each potential class member. Each candidate or employee is subject to only one of the four Appendices included in Policy 7.2.3, which are targeted at specific job categories.

Policy 7.2.3 is similar to the policies discussed in *Frazier v. Consol. Rail Corp.*, No. 85-845, 1986 WL 11237 (D.D.C. July 31, 1986), and *Houser v. Pritzker*, 28 F. Supp. 3d 222 (S.D.N.Y. 2014), but not to the extreme argued by WMATA. Each applicant or employee of WMATA is affected by the Appendix that pertains to the position they apply for, but not the remaining Appendices. Also, as discussed above, while similar, the Appendices may cover

slightly different types of criminal convictions and be more or less accepting of the existence of prior convictions in those categories. In order to represent a class containing all African-American candidates under Policy 7.2.3 the class representatives must cover all the Appendices. *See Houser*, 28 F. Supp. 3d at 247 (finding typicality because the class representatives included at least one individual who was harmed by each aspect of the employment practice); *Frazier*, 1986 WL 11237 (finding lack of typicality because class representatives only challenged particular aspects of the training program and approved of other aspects of the program that would impact other putative class members but not themselves).

Class representatives' claims are typical of the rest of the class if they address each part of Policy 7.2.3. The Court finds, as alleged, Plaintiffs have identified class representatives covering Appendices A, C, and F, but have failed to present a class representative to cover Appendix B, related to financial positions. Therefore, the class representatives are typical of other class members who were candidates for positions covered by Appendices A, C, and F of Policy 7.2.3.

### d. Adequacy

Rule 23(a)(4) requires a finding that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Two criteria for determining the adequacy of representation are generally recognized: 1) the named representative must not have antagonistic or conflicting interests with the unnamed members of the class, and 2) the representative must appear able to vigorously prosecute the interests of the class through qualified counsel." *Twelve John Does v. District of Columbia,* 117 F.3d 571, 575 (D.C. Cir. 1997).

Plaintiffs argue that the named plaintiffs are adequate because the named plaintiffs are not antagonistic to the unnamed class members and are able to vigorously represent

the interests of the class.  In fact, Plaintiffs note that named plaintiffs have been actively involved in the litigation since the very beginning, answering discovery and appearing for depositions as required.  WMATA's challenge to adequacy parallels its initial challenge to typicality, that some named class members are "clear losers" because of legitimate, non-discriminatory defenses to the failure to hire or because the named plaintiff failed to disclose prior convictions in the Complaint itself.  Cert. Opp. at 19-22.

In determining if a named representative is adequate, a court does not assess the ultimate strength or weakness of an individual claim.  "A plaintiff is not disqualified as class representative simply because 'he *may* fail to prove his case or [because] the defendant *may* have good defenses.'"  *Houser*, 28 F. Supp. 3d at 248 (quoting *Robinson v. Sheriff of Cook Cnty.*, 167 F.3d 1155, 1158 (7th Cir. 1999)).  The ultimate inability to maintain an individual claim for damages due to a legitimate defense to that named plaintiff's claim of discrimination does not create a conflict of interest that destroys the adequacy of class representatives.  The merits of an individual's claims will not cause the court to determine an individual is an inadequate representative, as the merits are not at issue at the class certification stage.  However, if it is clear at the class certification stage that an individual has not suffered injury as a result of the alleged discriminatory practice, that individual may be excluded as a named class representative.  An individual who did not suffer injury is "simply not eligible to represent a class of persons who did allegedly suffer injury."  *East Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 404 (1977).

WMATA argues that Louia McKenzie and Leroy Quarles are inadequate named plaintiffs because they lack standing, as they were not injured by the allegedly discriminatory Policy 7.2.3, but rather were not hired due to false statements or failures to disclose convictions

38

on their applications, not the existence of the convictions themselves. Cert. Opp. at 19-21. The injury-in-fact requirement of standing is met in a Title VII case when there is an adverse employment action. *See Douglas v. Donovan*, 559 F.3d 549, 551-52 (D.C. Cir. 2009) (holding that "[i]n order to present a viable claim of employment discrimination under Title VII, a plaintiff must show he suffered an adverse employment action"); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Both Louia McKenzie and Leroy Quarles allege they were not hired due to Policy 7.2.3, which is alleged to have a disparate impact on African-American candidates. The merits of their allegations are not part of the analysis at the time of class certification.

WMATA also argues that Mr. McClough and Mr. Little are inadequate class representatives because the Second Amended Complaint does not accurately represent the entirety of their criminal histories, therefore signifying that these class representatives lack the necessary credibility to represent the class. Cert. Opp. at 21-22. WMATA offers no legal support for its theory that failure to include all facts regarding the criminal history of proposed class representatives harms the credibility of the individual representatives. Although it may implicate a defense, these Plaintiffs' alleged failures to list all past convictions in the Second Amended Complaint does not immediately bear on the application of Policy 7.2.3 to them in this context or render them unfit to represent the class. The named plaintiffs satisfy the adequacy requirement of Rule 23.

Additionally, even if some class members cannot overcome WMATA's defenses, WMATA has not argued that it has a legitimate, non-discriminatory reason for failing to hire all the named plaintiffs. Thus, even if some named plaintiffs are eventually excluded from relief, others will remain. The Court also finds class counsel satisfies the adequacy requirement. As

noted by Plaintiff, Mem. in Supp. of Mot. for Cert. at 36, class counsel are experienced in class actions and other complex litigation. WMATA does not question the adequacy of class counsel.

## 2. Fed. R. Civ. P. 23(b)(2)

In addition to satisfying the requirements of Rule 23(a), Plaintiffs must move for certification under at least one subsection of Rule 23(b). Plaintiffs move for a hybrid Rule 23(b)(2) and (b)(3) class. A class action under Rule 23(b)(2) may be maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360. "'[C]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples' of what (b)(2) is meant to capture." *Id.* at 361 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)).

First, Plaintiffs argue Policy 7.2.3 is generally applicable to the class because it "applies to all candidates and employees," of WMATA, badge contractors, and MetroAccess and because it was designed to be comprehensive and non-discretionary in its application. Policy 7.2.3. at WMATA0002227. Plaintiffs also argue that "a single injunction or declaratory judgment would provide relief to each member of the class" because the requested injunction would prohibit WMATA from taking any further action under Policy 7.2.3, which would apply equally to all members of the proposed class. *Wal-Mart*, 560 U.S. at 360.

WMATA again argues that Plaintiffs' failure to identify which parts of Policy 7.2.3 produce a disparate impact, or failure to identify the "particular challenged employment practice," prohibits certification of the class under (b)(2). As the Court addressed above in the

discussion on typicality, Policy 7.2.3 can be understood as four separate practices, due to the four Appendices. Because only one Appendix will apply to each putative class member, each Appendix must be considered a separate employment practice. The Court, therefore, interprets Plaintiffs' challenge to Policy 7.2.3 in its entirety to be a challenge to each of the Appendices, as to one of which it has no representative plaintiff.

WMATA also argues that Plaintiffs conceded in depositions that some criminal convictions should be considered or are relevant to determinations of whether an individual is suited for a position as a bus driver or a MetroAccess driver. Therefore, WMATA argues, Plaintiffs have conceded that Policy 7.2.3 is, in some ways, properly tailored to exclude individuals with specific, relevant convictions. Plaintiffs' concessions do not concede the justification of Policy 7.2.3 as a whole, but rather concede that it is not unreasonable to have some criminal convictions used as disqualifying offenses for specific positions. Plaintiffs' argument here, however, is that Policy 7.2.3 is a blanket-prohibition or restriction on numerous types of convictions and is applied to all positions within WMATA and its contractors and subcontractors.

The Court finds that Plaintiffs have identified three of the Appendices of Policy 7.2.3 as the "particular challenged employment practice" and have adequately demonstrated that every putative class member will be affected by one of the three. Because no class representative has been identified that was harmed by Appendix B, the Court will not certify a class that falls under that Appendix. The Court also finds that an injunction applicable to the entire class could be fashioned upon a finding of liability.

### 3. Fed. R. Civ. P. 23(b)(3)

To certify a class under Rule 23(b)(3) class, the Court must find that "the questions of law or fact common to class members predominate over any questions affecting

41

only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Among the factors the Court should examine in making its determination are:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

> (D) the likely difficulties in managing a class action.

*Id*. The requirements of (b)(3) are often divided into two categories, superiority and predominance. The Court will examine these two requirements separately.

### a. Superiority

The first requirement of Rule 23(b)(3) is superiority. Superiority is met when a court determines that a class action is superior to other available means of adjudication. *See* Fed. R. Civ. P. 23(b)(3). The superiority requirement ensures that resolution by class action will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem,* 521 U.S. at 615.

Plaintiffs argue a class action is superior to individual actions due to the cost of litigating a disparate impact case and the relatively low damages available to a single successful litigant. Individual litigants often do not have the incentive to shoulder the burden of a complex case, but when combined into a class, the risks can be shared. WMATA makes no challenge to the question of superiority and this Court agrees. Title VII disparate impact cases often require complicated and costly expert evidence and involve voluminous discovery. When a group of

individuals may be disparately affected by a single policy, resolving the question of liability on a class-wide basis is the most efficient use of limited judicial resources and allows for consistent findings for all similarly-situated individuals.

### b. Predominance

The second requirement of Rule 23(b)(3) is that common issues predominate over issues that only affect individual class members. Although common issues must predominate, they need not be the dispositive issues of the litigation. *See Vitamins,* 209 F.R.D. at 262. In order to meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof, thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof. *See Amchem,* 521 U.S. at 623. "There is no definitive test for determining whether common issues predominate, however, in general, predominance is met 'when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class members' individual position.'" *Vitamins*, 209 F.R.D. at 262 (citing *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 693 (D. Minn. 1995)). Rule 23(b)(3)'s predominance requirement is "even more demanding than Rule 23(a)." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).

Plaintiffs argue the common question of Policy 7.2.3's disparate impact predominates over any individual issues and present Dr. Marc Bendick's methodology for determining damages as a class-wide system for damages. WMATA argues that individual damages questions will overwhelm the common issues, citing *Comcast* for the proposition that a class must establish that "damages are capable of measurement on a classwide basis" in order to satisfy the predominance requirement of Rule 23(b)(3). 131 S. Ct. at 1433. WMATA clarifies that individual questions will include whether the hiring entity had a reason, separate from Policy

7.2.3, for failing to hire the individual class member, whether any additional steps were required before the official offer of employment was extended, and whether the individual obtained another position thereby mitigating the potential backpay damages, etc.

Dr. Bendick's model, discussed above, does not provide a formulaic approach for determining class-wide damages or provide a universal system of damages. Instead, Dr. Bendick provides a formula to be used to calculate each individual class member's damages and to sum these findings for class damages. Plaintiffs have offered no way to avoid the need to evaluate individual defenses for the failure to hire a candidate or calculate individual damages; nor can they.

Although the D.C. Circuit has held that the necessity to determine individual damages awards does not itself preclude certification under Rule 23(b)(3), this case involves more than just the individual determination of damages. *See McCarthy v. Kleindienst*, 741 F.2d 1406, 1415 (D.C. Cir. 1984); *Coleman*, 306 F.R.D. at 85. After determining whether Policy 7.2.3 disparately impacted African-American candidates and evaluating WMATA's business justification for the use of Policy 7.2.3, the trier of fact must also determine, for each individual class member, whether that class member was not hired or fired due to the Policy 7.2.3, or for some other reason. WMATA has provided some facts to demonstrate that class representatives may have lied on their applications, which could provide a legitimate, non-discriminatory reason for failing to hire the individual. Therefore, it is not the individual calculation of damages that destroys predominance, but the individual determinations of why a class member was not hired by WMATA or a contractor that causes the Court to deny certification under (b)(3). Having already found that a class is a superior method to resolve the issue of liability under (b)(2), the Court will go no further.

While Plaintiffs fail to meet the predominance requirement of (b)(3) and, therefore, will not be certified as a class for monetary damages, the question of liability can be efficiently litigated on a class-wide basis under (b)(2).

> There are many ways of dealing with possible individual damages issues, if necessary, such as "(1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class."

*Johnson*, 248 F.R.D. at 57 (quoting *Carnegie v. Household Int'l, Inc.,* 376 F.3d 656, 661 (7th Cir. 2004)).

Rule 23(c)(4) gives the Court discretion to certify a class as to particular issues and resolve others on an individual basis, "so long [as] the proposed class satisfies the requirements of Rule 23(a) and (b) with respect to liability." *Houser*, 28 F. Supp. 3d at 253-54. As discussed above, the proposed classes satisfy the requirements of 23(a) and (b) as to liability and the availability of injunctive or other declaratory relief.

### 4. Fed. R. Civ. P. 23(g)

The Court finds Plaintiffs' counsel have demonstrated experience in handling class action claims, knowledge of the law at issue in this case, and diligence in pursuing the class claims to this point. The Court found above that Plaintiffs' counsel will fairly and adequately represent the interests of the class and, therefore, the Court appoints Arnold & Porter LLP, the NAACP Legal Defense & Education Fund, Inc., and the Washington Lawyers' Committee for Civil Rights as class counsel under Rule 23(g).

### C.  Leave to File Second Amended Complaint

Due to the Court's decision to redefine and certify classes based on the Appendices (and, therefore, the type of position applied for), rather than based on whether the class member applied to WMATA, MetroAccess, or a badge contractor, Plaintiffs' Motion for Leave to File a Second Amended Complaint is moot.  The Court will deny the motion without prejudice and permit Plaintiffs to file a revised amended complaint, if they so choose, based on the classes certified by the Court.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Leave to File a Second Amended Complaint will be denied without prejudice as moot; WMATA's Motion to Exclude Dr. Farber will be granted in part and denied in part; WMATA's Motion to Exclude Dr. Bendick will be granted; Plaintiffs' Motions to Exclude Dr. Stixrud's Initial Report and Declaration will be granted in part and denied in part; and WMATA's Motion to Exclude Dr. Siskin will be denied.

Plaintiffs' Motion for Class Certification will be granted in part and denied in part.  The Court will not certify a single, combined class at this time because the class representatives do not appear to include individuals covered by each Appendix in Policy 7.2.3. The Court will, however, certify the following three class specific to each Appendix with an existing class representative:

> Appendix A Class:  All African-American persons who, since February 23, 2012, have been denied employment with WMATA, or terminated or otherwise permanently separated from their positions, suspended with or without pay, and/or denied employment with any third-party contractor or subcontractor as a result of Appendix A.

> Appendix C Class:  All African-American persons who, since February 23, 2012, have been denied employment with WMATA, or terminated or otherwise permanently separated from their positions, suspended with or without pay, and/or denied

employment with any third-party contractor or subcontractor as a result of Appendix C.

Appendix F Class/MetroAccess Class: All African-American persons who, since January 1, 2013, have been denied employment with WMATA, or terminated or otherwise permanently separated from their positions, suspended with or without pay, and/or denied employment with any third-party contractor or subcontractor as a result of Appendix F.

A memorializing Order accompanies this Opinion.


Date: March 31, 2017

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge